# In the

# United States Court of Appeals

## For the Seventh Circuit

————————

No. 01-2470

PATTERSON FROZEN FOODS, INC.,

*Plaintiff-Appellee*,

v.

CROWN FOODS INTERNATIONAL, INC.,
a corporation f/k/a CROWN FOODSERVICE
GROUP, INC., and PHILIP H. ECKERT,

*Defendants-Appellants*.

————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 7305—**John C. O'Meara**, *Judge.**

————————

ARGUED FEBRUARY 19, 2002—DECIDED OCTOBER 15, 2002

————————

Before COFFEY, EASTERBROOK, and DIANE P. WOOD,
*Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* In May and June of
1998, plaintiff Patterson Frozen Foods sold seven bulk
shipments of frozen peas to Crown Foodservice Group,
a predecessor of defendant Crown Foods International.

———————————————

* The Honorable John C. O'Meara, United States District Judge
for the Eastern District of Michigan, sitting by designation.

Crown, owned by co-defendant Philip H. Eckert, defaulted on the purchases. The sale of frozen peas and other perishable goods is regulated by the Perishable Agricultural Commodities Act, 7 U.S.C. § 499 *et seq.* (PACA), a law enacted to protect produce sellers during the Great Depression and modified from time to time since then. Under certain circumstances, PACA allows produce sellers to establish a constructive trust over funds owed for sales on short-term credit and to recover against a responsible shareholder of the debtor company. Because we find that Patterson failed to observe the formalities necessary to preserve its PACA trust rights by agreeing in writing to extend time for payment, we reverse the judgment of the district court.

## I

Crown is a defunct Illinois corporation that once operated as a federally licensed produce dealer. Eckert was Crown's president and had check-signing authority. In May and June of 1998, Patterson, a produce wholesaler, sold Crown $58,600 worth of frozen peas. All of Patterson's invoices contained the statutory language required to preserve PACA trust rights and a payment term of net 30 days. Crown failed to pay. On December 21, 1998, after informal attempts to collect its debt proved fruitless, Patterson filed an administrative reparation claim pursuant to 7 U.S.C. § 499f with the United States Department of Agriculture (USDA). The USDA responded with a form letter stating the prerequisites to an investigation of the complaint and indicating its willingness to help the parties reach an acceptable settlement.

Negotiations continued between Neil Morosa, Patterson's Vice-President of Finance, and Eckert's son, Jason. On January 8, 1999, Jason faxed Morosa a proposed repayment plan providing for eight monthly payments of $8,356.46

plus 8.5% interest on the outstanding balance, with the first payment due February 8. Morosa faxed a reply that afternoon in which he moved the payment dates to the twentieth of each month beginning January 20 and adjusted the interest accordingly. Morosa's signature appears at the bottom of the fax.

On January 11, Morosa informed the USDA of this development. He stated that Crown "has proposed to pay the remaining invoices totaling $66,851.65 with interest at 8.5% over an eight month period, per the following schedule." After setting out a schedule identical to the one he had faxed Jason, Morosa wrote, "We are agreeable to this providing PACA will still be in force in case the respondent defaults on its plan." The next day, Morosa faxed Jason a copy of the letter and indicated a bank account to which he should wire the January 20 payment.

Crown made its first payment, but its financial troubles worsened and it sent only $2,000 on February 20. Three days later Morosa wrote the USDA, stating that Patterson "did enter into the proposed agreement with respondent to pay the outstanding invoices," but that, as Crown had failed to make its second payment, Patterson now considered the agreement void. Crown made further proposals to work out a revised payment plan, which Patterson rejected. On April 1, Patterson faxed a "Balance Due" schedule with a revised listing of payment due dates (through December 1999) and a place for Eckert to sign, but Eckert refused. On April 29, 1999, the USDA issued a reparation order in favor of Patterson for the amount due plus interest at 10%. Two months later it suspended Crown's PACA license, causing Crown to cease operations.

Patterson then filed a four-count complaint seeking enforcement of the reparation order against Crown under 7 U.S.C. § 499g(b) (Count I), alleging a breach of contract (Count II) and failure to account for assets under § 499b(4)

(Count IV) against Crown, and alleging that Eckert breached his fiduciary duties as trustee of a statutory trust under § 499e(c) (Count III). The parties stipulated to judgment against Crown on Counts I and II. After a bench trial, the district court found in favor of Patterson on the two remaining counts, entering judgment against both Crown and Eckert in the amount of $55,995. It also awarded attorneys' fees of $45,410 against both defendants.

## II

PACA comprehensively regulates the nation's produce industry. It authorizes the Secretary of Agriculture to license those who deal in "[f]resh fruits and fresh vegetables of every kind and character." 7 U.S.C. § 499a(b)(4)(A). (We do not know why *frozen* peas should be considered fresh or perishable, but as the parties have not made a point about this, we do not either.) Among its many provisions, PACA provides that perishable agricultural commodities received by a licensed dealer, as well as the proceeds from sales of those commodities, are held in trust for the benefit of unpaid suppliers until full payment has been made. 7 U.S.C. § 499e(c)(2). This floating trust is automatically created when the dealer accepts the goods so long as the supplier complies with the specific notice requirements set out in 7 U.S.C. § 499e(c) and 7 C.F.R. § 46.46(f). *Greg Orchards & Produce, Inc. v. Roncone*, 180 F.3d 888, 890-91 (7th Cir. 1999). PACA trust rights take priority over the interests of all other creditors, including secured creditors. *C.H. Robinson Co. v. Trust Co. Bank, N.A.*, 952 F.2d 1311, 1315 (11th Cir. 1992). Thus, PACA gives sellers of perishable goods a superior secured interest, just as a seller of durable goods may perfect an interest in its property. (A perishable goods dealer could of course take an Article 9 secured interest in its produce, but as these items are usually sold and

consumed rapidly and spoil quickly, that interest would not really be worth the bother.)

PACA trust rights may be enforced either through a reparation order issued by the Secretary of Agriculture and subsequent judicial enforcement, 7 U.S.C. § 499f & g, or through a court action for breach of fiduciary trust, 7 U.S.C. § 499e(c)(5). The latter remedy permits recovery against both the corporation and its controlling officers. *Golman-Hayden Co. v. Fresh Source Produce, Inc.*, 217 F.3d 348, 351 (5th Cir. 2000). The principal justifications Congress has given for granting such generous protection for sellers of produce are (1) the need to protect small dealers who require prompt payment to survive and (2) the importance of ensuring the financial stability of the entire produce industry. *In re Magic Rests., Inc.*, 205 F.3d 108, 111 (3d Cir. 2000).

In return for its protections, PACA establishes strict eligibility requirements. A PACA supplier must be selling produce on a cash or short-term credit basis. *Greg Orchards*, 180 F.3d at 891. The Secretary of Agriculture has determined that "the maximum time for payment for a shipment to which [parties] can agree and still qualify for coverage under the trust is 30 days after receipt and acceptance." 7 C.F.R. § 46.46(e)(2). If a produce supplier enters a written post-default agreement with a dealer that extends the dealer's time for payment beyond 30 days, the supplier becomes ineligible to assert its trust rights. *Greg Orchards*, 180 F.3d at 892; *In re Lombardo Fruit and Produce Co.*, 12 F.3d 806, 809 (8th Cir. 1993). On the other hand, an oral agreement for an extension or a course of dealing allowing more than 30 days for payment will not abrogate a PACA trust. *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 205 (3d Cir. 1998); *Hull Co. v. Hauser's Foods, Inc.*, 924 F.2d 777, 781-82 (8th Cir. 1991).

The principal dispute in this case is whether the post-default dealings between the parties nullified Patterson's PACA trust rights. Our earlier decision in *Greg Orchards*, which we are bound to follow, points the way to the resolution of the questions now before us. If Patterson and Crown entered a written post-default agreement giving Crown more than 30 days to pay for its peas, there is no enforceable PACA trust. That conclusion in turn would mean that Eckert was not subject to any fiduciary duty derived from PACA (which is the only source of such a duty alleged here). On the other hand, if the parties had no agreement at all to extend the time for payment, or if any such agreement was merely oral, then PACA remains in force and Eckert can be personally liable for any breach committed by Crown. The district court found that "[a]lthough several payment proposals were exchanged between the parties, no written agreement was executed to extend payment terms," and concluded from this that the PACA trust was still in force. We review the district court's fact finding for clear error and its legal conclusions *de novo*. *NRC Corp. v. Amoco Oil Co.*, 205 F.3d 1007, 1011 (7th Cir. 2000).

In *Greg Orchards*, a produce dealer, Merkel, failed to make payments to three suppliers: Greg, Lange, and Plantation. Greg and Lange executed written agreements setting weekly payment schedules, while Plantation sent Merkel an amortization schedule fixing monthly payments. Merkel paid under both plans for about 14 months and then defaulted. *Greg Orchards*, 180 F.3d at 889. At that point, the suppliers sued under PACA. Reversing the district court, this court held that Greg and Lange had indisputably entered into written post-default agreements extending time for payment beyond 30 days, precluding them from recovering. *Greg Orchards*, 180 F.3d at 892. Plantation's claim was remanded to the district court for determination of whether its amortization schedule was an enforceable written agreement. *Id.* at 892-93.

Patterson's claim here is nearly identical to Plantation's. There is no formal executed contract between the parties, but there is a written payment schedule which Morosa sent to both Crown and the USDA. Both the January 11 letter to the USDA and the January 12 fax to Crown declare that Patterson was "agreeable" to this schedule and ask Crown to wire payment to a specific bank account. Crown complied with its first payment. When it missed the second payment, Morosa informed the USDA that Patterson now considered the agreement void. The obvious corollary to this statement is that Patterson had previously considered the agreement effective. It had agreed to forebear from asserting its reparation claim, but only so long as Crown continued to make payments under the new plan. As in *Greg Orchards*, it is clear that the parties entered some sort of agreement.

Patterson argues that only a signed and executed "formal written contract" can abrogate a created PACA trust. Neither *Greg Orchards* nor any other prior decision we have found clearly establishes exactly what is necessary to create a "written agreement" for purposes of PACA. All of the cases rejecting the effect of mere oral agreements have involved nothing more than course-of-dealing evidence demonstrating that a supplier has routinely allowed the dealer more than 30 days to make payment. See *Hull Co.*, 924 F.2d at 778; *Stowe Potato Sales, Inc. v. Terry's, Inc.*, 224 B.R. 329, 333 (W.D. Va. 1998); *A & J Produce Corp. v. CIT Group/Factoring, Inc.*, 829 F. Supp. 651, 655 (S.D.N.Y. 1993). On the other hand, the only cases denying trust rights through post-default written agreements have involved formally executed documents. *Greg Orchards*, 180 F.3d at 892; *Lombardo*, 12 F.3d at 810; *Israel v. Merrill*, 812 So. 2d 347, 352 (Ala. Civ. App. 2001). No court has had to resolve whether a written agreement means merely a writing sufficient to satisfy

the Statute of Frauds or an actual executed agreement signed by both parties and integrating all relevant terms.

If all that is required for an agreement to be "written" for purposes of abrogating PACA rights is a document satisfying the Statute of Frauds, then Patterson is out of luck. The faxes and letters in this case, signed by Morosa as Patterson's agent, reasonably identify the contract's subject matter and demonstrate agreement on payment terms of $8,356.46 per month for eight months. The documents also state with reasonable certainty the unperformed promises in the contract, that Crown will pay on the dates indicated, and that Patterson will forebear from going forward with its PACA reparation action so long as payments are forthcoming. See Restatement (Second) of Contracts § 131; *Consolidation Serv., Inc. v. KeyBank Nat'l Ass'n*, 185 F.3d 817, 819 (7th Cir. 1999).

Patterson argues that more should be required to abrogate a PACA trust, relying on the general proposition that PACA is to be construed liberally in favor of sellers, and that it should therefore receive the benefit of the doubt in this dispute. See, *e.g.*, *Hull Co.*, 924 F.2d at 782. While we accept the general principle, we also note that PACA and PACA trust rights are designed to protect small produce sellers who operate in a cash market and depend upon prompt payment to survive. Patterson is not some poor local pea farmer but a sophisticated vegetable wholesaler. To the extent it (or even a smaller company) chose to bargain at arm's length to create an alternate remedy, it was at the same time choosing to opt out of the PACA regime. Filing a PACA trust claim may be beneficial to it in the short run, but if it prevails it might put one of its large buyers out of business (because the USDA will revoke the dealer's license). Therefore, it might decide in some instances to enter into extra-statutory arrangements even if this means relinquishing certain legal rights.

Another major objective of PACA is to avoid large financial collapses in the produce industry. The strict 30-day time limits are purposely designed to bring a subperforming dealer to the attention of the USDA quickly, so that it can act to resolve the problem or suspend the dealer's license. If one industry member is in financial distress, not much is at stake. But if many large wholesalers work out long-term payment plans and extensions, allowing a dealer to amass huge liabilities, that dealer's eventual bankruptcy or license revocation could cause much more severe repercussions throughout the industry. One would not want to reward the wholesalers who helped create such a mess by then giving them a strong right to recover their debts through superpriority in bankruptcy or through trust suits piercing the corporate veil.

Based on this analysis, we conclude that PACA rights are lost whenever the parties enter into a written agreement that satisfies the generally applicable Statute of Frauds. Nothing in either PACA itself or the policies that lie behind it justifies the judicial creation of a rule that can be satisfied only by a formally executed document with the word "CONTRACT" typed at the top. Also supporting our position is the fact that a PACA trust can be created through letters, invoices, or anything else reduced to writing with no requirement of formality. 7 C.F.R. § 46.46(f)(1); *In re Richmond Produce Co.*, 112 B.R. 364, 373 (Bankr. N.D. Cal. 1990). We see no reason why modification of the trust should require more than its creation.

With that rule of law established, the only thing left is to decide whether we have proof of a written agreement here. Patterson offers only minimal evidence to contest the existence of writings evidencing a specific agreement. It points to an April 1999 letter from Eckert to Patterson where Eckert notes that several attempts were made to

reach satisfactory payment arrangements and that he hopes the parties can come to some sort of agreement. But the letter was written long after Crown breached the relevant January agreement, and thus it has little or no bearing on the original existence of the first written agreement. The parties could have had an agreement in January and February but still tried to work out a new deal when the old one failed rather than force Patterson to sue for breach.

Patterson also briefly contends that it entered negotiations only "because of the PACA Department's Rules and Procedures," and that its written agreement was without prejudice to its PACA rights. However, no such rules and procedures have been introduced into evidence. All that is before us is a letter from the USDA stating that it will attempt to assist the parties in reaching a mutually satisfactory settlement. This is boilerplate and does not come close to establishing that the USDA somehow compelled Patterson to negotiate a repayment schedule or told it that agreeing to such a plan would not implicate its rights to a PACA trust. As for the attempted reservation of rights, we conclude that private parties do not have the power to modify the statutory formalities that Congress put in place for the creation and maintenance of an enforceable PACA trust.

In the end, the only possible conclusion to be drawn from the evidence is that Patterson entered into a post-default written agreement extending payment terms that abrogated its PACA rights. To the extent the district court found otherwise, its determinations were based on a view of the law that we have rejected and as such are clearly erroneous.

The defendants have also asked us to reverse the award of attorneys' fees entered against them. Because we are reversing judgment on the only claim against Eckert, the

attorneys' fee claim against him must be vacated. Patterson prevailed pursuant to a stipulated judgment against Crown on some counts, however, and so we will vacate the fee award against it and remand for recalculation relating only to those counts (worthless though such a judgment apparently is, as it appears that Crown has no assets).

### III

We conclude that a written agreement need not be formally executed by both parties to abrogate PACA trust rights and that the payment schedule and letters in this case constitute a written agreement to permit Crown to pay its obligations more than 30 days after shipment in violation of PACA. We therefore REVERSE the judgment of the district court and REMAND this case for entry of judgment in favor of the defendants on Counts III and IV and a recalculation of attorneys' fees.

A true Copy:

       Teste:

                    _____

                    *Clerk of the United States Court of*
                      *Appeals for the Seventh Circuit*

USCA-02-C-0072—10-15-02