NO. 07-09-0213-CV

 

IN THE COURT OF APPEALS

 

FOR THE
SEVENTH DISTRICT OF TEXAS

 

AT
AMARILLO

 

PANEL A

 

 AUGUST 31, 2010



 



 

 

WEST TEXAS HOSPITALITY, INC. D/B/A

 ENERSERV CONSULTANTS, APPELLANT

 

v.

 

ENERCON INTERNATIONAL, INC.

AND PAUL SAXTON, APPELLEES 



 

 



 

 FROM THE 99TH DISTRICT
COURT OF LUBBOCK COUNTY;

 

NO. 2008-545,369; HONORABLE WILLIAM SOWDER, JUDGE



 

 



 

 

Before CAMPBELL and HANCOCK and PIRTLE,
JJ.

 

 

MEMORANDUM OPINION

 

            Appellant,
West Texas Hospitality, Inc. d/b/a WTH Consultants ("WTH"), appeals the
trial court's order issued in favor of Appellee, Enercon International, Inc.
and Paul Saxton (collectively "Enercon") dismissing WTH's suit based
upon a forum selection clause in a written contract.   In a
single issue, WTH asserts the trial court erred in its finding that there was an
enforceable written contract between the parties.  We reverse and remand for further proceedings
consistent with this opinion.

Background

            In February 2008, WTH[1] filed its Original Petition
alleging Enercon[2]
 wrongfully retained monies paid by WTH in
anticipation of execution of a written contractual agreement.  WTH asserted actions for conversion, collection,
and quantum meruit/unjust enrichment.  In
its Amended Special Appearance, Motion to Dismiss, and Original Answer filed in
January 2009, Enercon sought to dismiss WTH's suit based upon a forum-selection
clause contained in a written agreement which required any suit to be filed in
Minnehaha County, South Dakota.  WTH
responded by contending that there was no written agreement because Enercon
never signed the proposed contract as presented by WTH.  In support of their respective arguments, the
parties submitted evidence through affidavits and exhibits attached to their pleadings.

            In January 2008, WTH approached Enercon asking for a
proposed contract to review.  Enercon offered
its "Authorized Affiliate Agreement" ("Agreement").  Among other things, the Agreement provided
that WTH would pay $43,900 to Enercon[3] in return for the right to
sell Enercon products throughout the United States on a non-exclusive basis in
addition to receiving training, customer support, a demonstration kit, startup
quantities of Enercon's promotional materials and a "product credit"
up to $45,000.  WTH's "product
credit" would be used on materials and services purchased from Enercon for
projects approved by Enercon within 120 days of completion of WTH's initial
training.  The Agreement also provided,
in pertinent part, as follows:

14.  CHANGES
TO AGREEMENT:  This agreement may
not be changed except by written consent of all parties and may not be changed
orally.

16.  ACCEPTANCE
OF CONTRACT AND EXECUTION DATE:  [WTH]
shall sign duplicate originals of the Agreement and submit both originals with
full payment to [Enercon].  Should
[Enercon] reject the Agreement, [WTH] will be notified of such fact in writing
and full payment shall be returned promptly. 
Should [Enercon] accept the agreement, [Enercon] will date and sign the
duplicate originals of the agreement submitted and return one of the fully
executed originals for [WTH] at [WTH's] address shown above.  The Agreement shall be binding upon all
parties the date [Enercon] dates and signs the duplicate originals, which shall
be the "execution date of the Agreement."  [WTH] shall have a right of rescission for
three days from the date of the agreement.

18.  SOLE
AGREEMENT:  There are no other
agreements or understandings, either oral or in writing between the parties
effecting this agreement or relating to the sale of the Product(s), except as
otherwise specifically provided herein . . . . 
This agreement contains all the oral written agreements, representations
and arrangements between the parties hereto. 
It is understood between the parties that there are no representations
or warranties made or implied except as specifically set forth herein.

21.  SUIT
VENUE:  This agreement is
performable in Minnehaha County, South Dakota. 
Any claim, cause of action, or other legal suit arising from, or as a
result of this agreement shall be brought in State Court in Minnehaha County,
South Dakota . . . .

24.  EXECUTION
KNOWING AND VOLUNTARY:  The
parties hereby acknowledge and represent that they (a) have fully and carefully
read this agreement prior to execution; (b) have been, or have had the
opportunity to be fully apprised by any attorneys of their choice of the legal
effects and meaning of this document and all terms and conditions hereof, . . .
(d) are executing this agreement with full knowledge of the ramifications
thereof.  

30.  SUPERCEDE:  This contract supercedes and replaces any
previous contract or agreement between the parties herein.

 

            The Agreement also contained two signature blocks, one
each for Enercon and WTH.  Each signature
block was prefaced by the statement "Accepted by [Enercon]" and
"Accepted by [WTH]," respectively. 


            Kirit Desai, on behalf of WTH, made
a number of handwritten changes to the proposed contract.  Specifically, he extended the time within
which Enercon was required to apply WTH's "product credit" from 120
days to 150 days of completion of WTH's initial training.  He also amended the Agreement's terms
regarding termination as follows: 
"This agreement may also be terminated by circumstances beyond
[Enercon's] control that make it impossible or impractical for the business
activities contemplated by this agreement to be continued, in which case the remaining balance from the payments made will be
refunded if termination happens within 150 days from the payment."  (Emphasis supplied on handwritten changes).  In addition, Desai amended a number of the
time-specific provisions in the termination paragraph to make ten day time
limits, ten business days.  (Emphasis supplied on handwritten
changes).  

            On March 3, 2008, Desai signed the modified contract and,
on March 4, wired his first installment of $26,000.  The following day, Enercon received the modified
contract signed by WTH and invoiced WTH for $43,900.[4]  Prior to making their second installment
payment, WTH ordered $5,000 worth of Enercon products.  Enercon responded by invoicing WTH for "HiBrite
Fixtures, Lamps, Retro Kit and freight, $5002.75," and stamped the invoice
"PAID."

            On April 7, Desai sent an internal e-mail
to another WTH officer, and expressed concern that they had "not received
a signed copy of [their] agreement with Enercon."  Desai wanted to start a countdown of the
number of days remaining to recover their $43,900 from Enercon, i.e., "[h]ow much time we have
left and how much sales we have to generate within that time."

            On April 7, Enercon and WTH exchanged a number of e-mails
related to the deadline for WTH's "product credit."  Paul Saxton sent an e-mail to Desai
indicating that WTH's "product credit" was good for 120 days from
completion of WTH's initial training.  In
response, Desai indicated that he had altered the Agreement as tendered by
Enercon to permit WTH 150 days on the "product credit" deadline.  Desai also indicated that his calculations
indicated the "product credit" would not expire until August 18 and asked
Saxton to verify there was a $42,000 "product credit" remaining.  Saxton responded to Desai saying:  "Did I sign that?  I don't recall . . . I don't know why this
would have been changed as we already increased it to 120 days from the usual
90 days."

            On May 6, WTH made a second installment
payment to Enercon, deducting $5,002.75 for the products purchased in March.  WTH also requested Enercon's services to
design projects and Enercon invoiced WTH for their services.[5] 

            In August, WTH had yet to receive an
executed copy of the Agreement as amended by Desai and the deadline was
approaching for WTH's use of its "product credit."  On August 4, Desai sent an e-mail to Saxton
indicating that the "product credit" deadline was approaching and
asked for an extension to complete a project and close on others.  Saxton responded he had checked the Agreement
and the "product credit" deadline of 120 days had already
expired.  Desai responded by sending a
copy of his amendments to the Agreement and asserted that the "product
credit" deadline of 150 days had not expired.  Desai's calculations indicated that WTH had
until August 18 to use the remaining credit of $42,000.[6]

            On August 25, Desai received a
letter from Enercon's attorney stating, in pertinent part, as follows: 

I am writing with regard to invoices/purchase
orders you recently sent to our client. 
My client is unable to fill the orders as submitted on your desired
terms for three reasons. 

First, as my client noted in prior
correspondence, the invoices/purchase orders you submitted were submitted
outside of the 120-day-product-credit window set forth in the Enercon Affiliate
Agreement as it was offered to you.  The
unauthorized alterations you made to the Agreement that you signed were not
effective to extend this period. 

Second, as noted in the Affiliation
Agreement, your product credit must be used "only on complete Enercon
approved, engineered, and designed products."  The document you
have submitted are for products and quantities vastly different from those
approved by my client. 

Third, your orders involve at least one
entity that my client has never heard of and therefore could not have possibly
approved. 

My client therefore cannot provide these
materials as currently requested on a product-credit basis. 

            Following submission of the parties' pleadings and exhibits,
the trial court heard counsel's argument in a short hearing on Enercon's motion
to dismiss.  Enercon acknowledged that it
did not sign the Agreement but asserted WTH was bound by its terms because WTH had
signed.  Although the Agreement signed by
WTH contained Desai's changes, Enercon contended WTH performed under their Agreement without the changes made
by Desai.  WTH contended the contract
signed by Desai and returned to Enercon was a counter-offer that was not
accepted because it was never signed by Enercon.  WTH asserted that, because the counter-offer
was not executed by Enercon, there was no written agreement between the two
companies and the forum selection clause was unenforceable.  

            Thereafter, the trial court entered
its order denying Enercon's Special Appearance and granting Enercon's motion to
dismiss stating "[t]his dismissal is based upon the forum selection clause
contained in the Authorized Affiliate Agreement between the parties."  This appeal followed.    

            Standard of Review

            A motion to
dismiss is the proper procedural mechanism for enforcing a forum-selection
clause against a party to the contract who violated the clause in filing
suit.  Ramsay v. Tex. Trading Co., 254 S.W.3d
620, 626 (Tex.App.--Texarkana 2008, pet. denied).  While we review the trial court's ruling on a
motion to dismiss for abuse of discretion; see
In re Lyon Fin. Servs., 257 S.W.3d 228, 231-32 (Tex. 2008) (per curiam), to the extent that our
review involves the construction or interpretation of an unambiguous contract,
the standard of review is de novo.  Phoenix
Network Techs. (Europe) Ltd. v. Neon Sys., Inc.,
177 S.W.3d 605, 610 (Tex.App.--Houston [1st Dist.] 2005, no pet.).  This is so because "a trial court has no
'discretion' in determining what the law is or applying the law to the
facts"; Walker v. Packer, 827
S.W.2d 833, 840 (Tex. 1992), and "abuses its discretion" if it
misinterprets or misapplies the law.  Perry Homes v. Cull, 258
S.W.3d 580, 598 (Tex. 2008).

            Forum-selection Clause

            The trial
court's order does not contain a specific finding of the existence of a written
agreement, nor did the trial court make findings of fact and conclusions of
law.  However, as the parties' briefs
make clear, the trial court's order of dismissal clearly rests on the legal
conclusion that WTH is bound to the forum-selection clause in the Agreement on
which Enercon relies.  

            As the party seeking to enforce a
contractual forum-selection clause, Enercon had the initial burden of establishing
that it and WTH agreed to an exclusive forum and the agreement applied to WTH's
claims.  Phoenix Network, 177 S.W.3d at 611-12
& n.6.  See Barnett v. Network Solutions, Inc.,
38 S.W.3d 200, 203 (Tex.App.--Eastland 2001, pet. denied).[7]  If Enercon met these prerequisites, the
burden would then shift to WTH to make a "strong showing" overcoming
the prima facie validity of the
forum-selection clause.  Phoenix Network, 177
S.W.3d at 611.

            To establish the existence of an
enforceable contract, a party must prove (1) an offer, (2) acceptance of the
offer, (3) mutual assent or "meeting of the minds" regarding the
subject matter and essential terms of the contract, and (4) consideration, or
mutuality of obligations.  See Domingo v. Mitchell, 257 S.W.3d 34,
39 (Tex.App.--Amarillo 2008, pet. denied). 
In determining whether the parties have formed a contract through offer,
acceptance and mutual assent to the contract terms, we rely on the objective
standard of what the parties said and how they acted, not on their subjective
state of mind.  Id.; Texas Disposal Sys. Landfill, Inc. v. Waste
Mgmt. Holdings, Inc., 219 S.W.3d 563, 589
(Tex.App.-Austin 2007, pet. denied).  Moreover, as with any other contract, "the
parties' intent is governed by what they said, not by what they intended to say but did not."  Feiss v. State Farm Lloyds, 202 S.W.3d 744, 746 (Tex. 2006)
(emphasis in original).  

            Enercon's initial offer, the
Agreement, expressly states WTH must accept by signing "duplicate originals of the Agreement." 
(Emphasis added).  Thereafter, Enercon
would accept by "dat[ing] and sign[ing] the duplicate originals of the
agreement submitted and return one of the fully executed originals for [WTH] at
[WTH's] address shown above."  The
Agreement then would "be binding upon all parties the date [Enercon] dates
and signs the duplicate originals, which date shall be the 'execution date of
Agreement.'"  As such, the Agreement
would be the parties' "sole agreement," embodying "all
representations or warranties made or implied except as specifically set forth
[therein]."  Any changes to its
terms were required to be "by written consent of all parties."

            The unambiguous language of the
Agreement, then, required that Enercon sign, date, and deliver a duplicate
original to WTH before it became an enforceable
contract binding on either party.  "If
an instrument, even though signed, is delivered with the understanding that it
is not to be binding as a contract until signed by another, the failure of the
other person to sign the instrument destroys the very existence of the
contract."  Baccus v. Plains Cotton Cooperative Association, 515 S.W.2d 401,
402-03 (Tex.App.--Amarillo 1974, no writ) (citing Thomason v. Berry, 276 S.W. 185 (Tex. Comm'n App. 1925, judgmt.
adopted)).[8]  Because Enercon failed to offer any evidence
that it signed and delivered[9] the Agreement to WTH in the
manner required, Enercon failed in its initial burden of proving the parties mutually
assented to the Agreement or the forum-selection clause contained therein.

            Furthermore, although WTH signed the
Agreement, Desai did so only after altering its terms.  See
Paragraph 16 of the Agreement ("Affiliate shall sign duplicate originals of the Agreement").  As such, Enercon also failed to offer any
evidence WTH ever accepted Enercon's original offer--the Agreement.[10]  

            Enercon asserts that WTH's orders
for goods and services constituted acceptance of the original Agreement.  However,
while the invoices, themselves, could be evidence of individual contracts in
their own right; see A.F. Knight v.
Virginia Mirror Co., 463 S.W.2d 428, 429 (Tex. 1971); F.H. Berry v. Pierce Petroleum Corp., 120 Tex. 452, 39 S.W.2d 824,
825-26 (1931), they may not act as a substitute for acceptance under the
Agreement because the subject matter of the Agreement does not permit
acceptance by any other means including performance.  Neither was there any evidence of any change
to the method of acceptance by "written consent of all parties."[11]  To the contrary, in his letter to WTH,
Enercon's attorney relies on the terms of the original Agreement offered to WTH while describing Desai's
handwritten terms as "unauthorized alterations."  

            While Enercon correctly points out
that "it is not necessary in order to constitute a 'contract in writing'
that the agreement be signed by both parties; one may sign and the other may
accept by his acts, conduct or acquiescence in the terms of the agreement";  see
Pierce v. Pickett, 432 S.W.2d 586, 589 (Tex.Civ.App.--Amarillo 1968, no
writ), this rule does not apply here where "at least one of the parties has
sufficiently expressed his intention not to be bound without [a signature],"
and "the parties have made [signatures] necessary at the time they express
their assent and as a condition modifying that assent."  Simmons,
286 S.W.2d at 418 (quoting Corbin on Contracts, Vol. 1, §§ 31 and 32, pp. 85 and 92).  Here, in the absence
of the written consent of the parties to a different mode of acceptance, Enercon
and WTH were expressly required to sign and deliver the Agreement to each other
before there was an enforceable
contract.  Id. at 418-19.[12]  See
Birchminster, 517 S.W.2d at 612.

            WTH's response to Enercon's motion
to dismiss and arguments made by WTH's counsel at the hearing belie Enercon's
assertion that WTH waived its argument on appeal that Enercon's signatures were
required before the Agreement would be enforceable.  This issue was argued in WTH's pleadings and
at the hearing.[13]  The trial court's order stated that it
considered the evidence, pleadings and argument of counsel.  As a result, we conclude the issue was not
waived.  See Tex. R. App. P. 33.1(a). 
See also Piazza v. City of Granger, 909 S.W.2d 529, 532 (Tex.App.--Austin
1995, no writ) (issue whether statutory notice was defective not waived where
counsel argued notice was invalid and copy of notice was attached to pleading);
FDIC v. Attayi, 745 S.W.2d 939, 942
(Tex.App.--Houston [1st Dist.] 1988, no writ) (issue whether guarantee
agreement specifically provided for renewal not waived where counsel argued
debt in issue had been renewed and copy of guaranty attached to pleading).[14]  Likewise, here, WTH argued the issue and
incorporated an attached copy of the Agreement into its response. 

            Because Enercon failed in its initial
burden of establishing that the parties mutually assented to the Agreement or
its forum-selection clause, WTH's sole issue is sustained.

Conclusion

            We reverse the
judgment of the trial court and remand for further proceedings consistent with
this opinion.  

 

                                                                                    Patrick A. Pirtle

                                                                                          Justice  

    

            

            

            

            

            

            

            











[1]WTH
is a Texas corporation doing business in Lubbock County, Texas.  Kirit Desai, WTH's President, resides in
Lubbock County.





[2]Enercon
is a South Dakota corporation with its principal place of business in Sioux
Falls, South Dakota.  Paul Saxton,
Enercon's President, resides in Ohio.  





[3]Enercon's
proposed Agreement required that WTH pay Enercon two installments equaling
$43,900.  





[4]The
invoice stated "$43,900 for 1 HiBrite Dealership - HiBrite dealership NON
EXCLUSIVE, Out-of-state sale, exempt from sales tax."  





[5]These
invoices were as follows:  (1) dated
August 27 and stamped PAID, $400 for 1 Survey Fee United Supermarket
Out-of-state sale, exempt from sales tax; (2) dated August 28 and stamped PAID,
$400 for Sonic Drive-In survey, Out-of-state, exempt from sales tax; (3) dated
May 21 and stamped PAID, $400, 1 Survey Fee, Shamrock Chevrolet Survey,
Out-of-state, exempt from sales tax; and (4) dated May 21 and stamped PAID,
$400, 1 Survey Fee, Survey Fee Gene Messer, Out-of-state, exempt from sales
tax.





[6]The
record also contains two e-mails between Desai and Nelsi Rodriquez, an Enercon
employee.  Desai sent Rodriquez an e-mail
stating: "I am sorry I should have called you to let you know that I found
my copy [of the Agreement] on my computer. 
Thanks for your help." 
Rodriquez responded:  "I take
that you no longer need the affiliate agreement, you found it?"





[7]See also Reuben Lowing v. Williams, No.
07-03-0393-CV, 2005 Tex. App. LEXIS 62, at *5 (Tex.App.--Amarillo 2005, no
pet.) (not designated for publication).





[8]"Evidence
of mutual assent in written contracts generally consists of signatures of the
parties and delivery with the intent to bind."  Baylor Univ. v. Sonnichsen, 221 S.W.3d 632, 635 (Tex. 2007) (collected
cases cited therein).  Parties may
provide that the signature of each party is a prerequisite to a binding written
contract; In re Bunzl, 155 S.W.3d
202, 209 (Tex.App.--El Paso 2004, no pet.) (citing Corbin on Contracts § 2.10
at 165 (Joseph M. Perillo rev. 1993), and, "[w]here parties to a written
contract intend that it shall not be binding until it is signed by the parties,
the signatures of both parties are required to give effect to the
contract."  Birchminster Resources v. Corpus Christi Management Co., 517 S.W.2d
608, 611 (Tex.App.--Corpus Christi 1974, writ dism'd) (citing Simmons & Simmons Constr. Co. v. Rea,
155 Tex. 353, 286 S.W.2d 415, 418-19 (1955).





[9]Where
there is no delivery of the contract, there is no mutual assent and, hence, no
contract.  Baylor Univ., 221 S.W.3d at 635.  "If the reduction of the agreement to
writing is thus made necessary, an assent to the writing as a sufficient one
must also be manifested; this manifestation commonly consists of signing and
delivery."  Simmons, 286 S.W.2d at 418.  See
Baccus, 515 S.W.2d at 402.  "An acceptance which resides solely
within the exclusive knowledge of the acceptor without being communicated to
the offeror is ordinarily no binding acceptance."  Advantage Physical Therapy, Inc. v. Cruse, 165 S.W.3d 21, 26
(Tex.App.--Houston [14th Dist.] 2005, no pet.).  See Tex. Association of Counties County Government Risk Management Pool
v. Matagorda County, 52 S.W.3d 128, 132 (Tex. 2000); Peden Industries v. Dahlstrom Corp., 520 S.W.2d 876, 877
(Tex.App.--Beaumont 1975, no writ).





[10]"It
is an established rule of contracts that when a specific mode of acceptance is
given within an offer, the offeree must convey his acceptance in the precise
mode expressed within the offer in order to create a binding agreement."  Abraham Investment Company v. Payne Ranch, Inc., 968 S.W.2d 518,
525 (Tex.App.--Amarillo 1998, pet. denied).  See
Advantage Physical Therapy, Inc.,v. Cruse, 165
S.W.3d 21, 25 (Tex.App.--Houston [14th Dist.] 2005, no pet.); Morrow v. De Vitt, 160 S.W.2d 977, 983
(Tex.Civ.App.--Amarillo 1942, writ ref'd w.o.m.).  "The acceptance must be identical with
the offer; otherwise there is no binding contract;" Domingo v. Mitchell, 257 S.W.3d 34, 39 (Tex.App.--Amarillo 2008,
pet. denied); Gilbert d/b/a Consulting
Economists v. Pettiette, 838 S.W.2d 890, 893 (Tex.App.--Houston [1st Dist.]
1992, no writ), and "any attempt to change an offer operates as a
rejection and counteroffer."  Komet v. Graves, 40
S.W.3d 596, 601 (Tex.App.--San Antonio 2001, no pet.); Harris v. Balderas, 27 S.W.3d 71, 77 (Tex.App.--San Antonio 2000,
pet. denied).  See United Concrete Pipe Corp. v. Spin-Line
Co., 430 S.W.2d 360, 364 (Tex. 1968) ("It is well settled that an
acceptance must not change or qualify the terms of the offer.  If it does, the offer is
rejected.")    





[11]Neither
can the e-mails between Desai and Rodriquez constitute any acceptance even if
they could be interpreted as Enercon suggests which is doubtful.  Further, the Agreement expressly provided
that it contained "all oral written agreements, representations and
arrangements between the parties hereto." 






[12]Neither
Bocchi Americas Associates, Inc. v.
Commerce Fresh Marketing Inc., 515 F.3d 383 (5th Cir. 2008) nor McCarty v. C.H. Langdeau, 337 S.W.2d 407
(Tex.App.--Austin 1960, writ ref'd n.r.e.), are of any avail to Enercon.  Neither court was required to determine
whether acceptance occurred in conformity with an express contractual provision
requiring the parties' signatures before the contract was enforceable.  See
515 F.3d at 391-92; 337 S.W.2d at 412.





[13]In
WTH's response to Enercon's motion to dismiss, WTH asserted "[Enercon]
never signed the [agreement] and never assented to the terms of the [agreement]
either verbally or by course of conduct. . . .  Plaintiff
and Defendant have never entered into a written contract."  WTH also incorporated by reference into their
response Desai's affidavit and the Agreement including paragraph "16.  ACCEPTANCE OF CONTRACT AND EXECUTION
DATE" as well as WTH's internal e-mails wherein the only method of
acceptance discussed was by signature and execution of the Agreement by both
parties.  At the hearing, WTH's counsel
asserted "[t]here is no contract . . . no meeting of the minds. . . .  He never signed it; the guy never signed it. .
. .  If there is no contract, then the
Forum Selection Clause is poof."  





[14]Neither does Century 21 Real Estate Corp. v. Hometown
Real Estate Co., 890 S.W.2d 118, 124 (Tex.App.--Texarkana 1994, writ
denied) nor Wohlfahrt v. Holloway,
172 S.W.3d 630, 640 (Tex.App.--Houston [14th Dist.] 2005, no pet.), cert. denied, 549 U.S. 1052, 127 S.Ct.
666, 166 L.Ed.2d 514 (2006) require a different result as Enercon
suggests.  In Century 21, the appellate court refused to allow International to
assert on appeal that Hometown was a "consumer" under the DTPA when,
before the trial court, International had asserted only that International was a seller of goods and
services to Hometown.  In Wolhlfahrt, the appellate court refused
to permit Wohlfahrt to assert on
appeal the court was bound to set post-judgment rates under a statutory
provision different than that argued
before the trial court.  172 S.W.2d at 639-40.